**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY<br><br>                    Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY<br><br>                    Defendant. | Civil Case No. 18-158 |

**MEMORANDUM OF POINTS AND AUTHORITIES OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Public Employees for Environmental Responsibility ("PEER" or "Plaintiff") hereby moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(b) and Local Rule 7(h) and opposes Defendant U.S. Department of Homeland Security ("Defendant" or "DHS")'s Motion for Summary Judgment.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................................iii

PRELIMINARY STATEMENT ...................................................................................................... 1

ARGUMENT .................................................................................................................................... 2

    I.     THE DELIBERATIVE PROCESS PRIVILEGE IS NOT APPLICABLE TO THE WITHHELD MATERIALS ............................................................................................. 5

        A.    THE WITHHELD DOCUMENTS ARE NOT PREDECISIONAL ............................ 9

        B.    THE WITHHELD DOCUMENTS ARE NOT DELIBERATIVE ............................ 15

    II.    SEGREGABILITY .......................................................................................................... 27

CONCLUSION ............................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Ancient Coin Collectors Guild v. United States Dep't of State*, 641 F.3d 504 (2011).....26

*Armstrong v. Exec. Office of the President*, 97 F.3d 575 (D.C. Cir. 1996).........................30

*Arthur Andersen & Co* v. *IRS,* 679 F.2d 254 (D.C. Cir. 1982)................................. 16

*Batton v. Evers*, 598 F.3d 169 (5th Cir. 2010) ...............................................................3

*Cause of Action Inst. v. United States DOJ*, 330 F. Supp. 3d 336 (D.D.C. 2018)...... passim

*Citizens for Responsibility & Ethics in Washington v. Nat'l Archives & Records Admin.*,
    583 F. Supp. 2d 146 (D.D.C. 2008)......................................................................9, 15

*Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ...6, 19

*Conservation Force* v. *Jewell*, 66 F. Supp. 3d 46 (D.D.C. 2014) ........................................... 16

*Cooper Cameron Corp. v. U.S. Dep't of Labor*, *OSHA*, 280 F.3d 539 (5th Cir. 2002) ........3

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976)................................................... 31

*Dudman Communications Corp. v. Department of the Air Force,* 815 F.2d 1565 (D.C. Cir.
    1987)................................................................................................................... 24

*Ecological Rights Found. v. FEMA*, No. 16-cv-05254, 2017 U.S. Dist. LEXIS 197451,
    2017 WL 5972702 (N.D. Cal. Nov. 30, 2017)...........................................................4

*Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1 (D.C. Cir. 2014) ........................ 29

*EPA v. Mink*, 410 U.S. 73 (1973) ...............................................................6, 9, 22, 30

*Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28 (D.D.C. 2006) ............................ 16

*Hodge v. FBI*, 703 F.3d 575 (D.C. Cir. 2013) ...........................................................29

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).........................................................6

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989) ....................................... 31

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004)................................9

*Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F.Supp.2d 252 (D.D.C. 2004) ..................... 16

*Judicial Watch, Inc. v. United States Dep't of Defense*, 2016 U.S. Dist. LEXIS 11872
    (D.D.C. 2016) ............................................................................................................. 19

*Lahr v. NTSB*, 453 F. Supp. 2d 1153 (C.D. Cal. 2006)........................................................23, 24

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) .............................................................3

*Loving v. Dep't of Defense*, 550 F.3d 32 (D.C. Cir. 2008) ....................................................... 28

*Mapother v. Dep't of Justice*, 3 F.3d 1533 (D.C. Cir. 1993)...............................................24, 25

*Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ...............16, 30

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1984)..............................................................................3

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) .....................................................................4, 14

*Nat'l Assoc. of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)............................. 16

*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16 (D.C. Cir. 1999) ......3

*Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir. 1977) ........ 19

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)...................................................................6

*Paisley v. CIA*, 712 F.2d 686 (D.C. Cir. 1983) ..............................................................................9

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) .................6, 16

*Playboy Enters., Inc. v. Dep't of Justice*, 677 F.2d 931 (D.C. Cir. 1982).....................10, 22

*Quinon v. Fed. Bureau of Investigation*, 86 F.3d 1222 (D.C. Cir. 1996).....................13, 30

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168 (1975) .......................9

*Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62 (D.D.C. 2018) .................................4

*Russell v. Department of the Air Force,* 682 F.2d 1045 (D.C. Cir. 1982) ........................... 24

*Seife v. United States Dep't of State*, 298 F. Supp. 3d 592 (S.D.N.Y. 2018) ..................... 13

*Senate of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574 (D.C. Cir. 1987).............................................................................................................5, 15

*Taxation with Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981) ..................... 19

*United States v. Nixon*, 418 U.S. 683 (1974) ........................................................... 20

*Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010) .......................................... 30

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) ........................................... passim

**Statutes**

5 U.S.C. § 552....................................................................................................1, 3, 5

**Other Authorities**

DHS, Nᴀᴛɪᴏɴᴀʟ Mɪᴛɪɢᴀᴛɪᴏɴ Fʀᴀᴍᴇᴡᴏʀᴋ, Sᴇᴄᴏɴᴅ Eᴅɪᴛɪᴏɴ 6 (2016) ....................................... 17

DHS, Nᴀᴛɪᴏɴᴀʟ Pʀᴇᴠᴇɴᴛɪᴏɴ Fʀᴀᴍᴇᴡᴏʀᴋ, Sᴇᴄᴏɴᴅ Eᴅɪᴛɪᴏɴ (2016) ........................................ 17

DHS, Nᴀᴛɪᴏɴᴀʟ Rᴇsᴘᴏɴsᴇ Fʀᴀᴍᴇᴡᴏʀᴋ, Tʜɪʀᴅ Eᴅɪᴛɪᴏɴ (2016) ................................................ 17

GAO-16-243 Eʟᴇᴄᴛʀᴏᴍᴀɢɴᴇᴛɪᴄ Tʜʀᴇᴀᴛs 20 (2016)............................................................8, 17

Nathan Anderson, GAO, *Electromagnetic Events Roundtable Discussion: Key GAO Findings and Recommendations* (Feb. 27, 2019), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Anderson-2019-02-27.pdf ....................................................................................................................8

Rᴀɴᴅ Cᴏʀᴘ., Hᴏᴍᴇʟᴀɴᴅ Sᴇᴄᴜʀɪᴛʏ Nᴀᴛɪᴏɴᴀʟ Rɪsᴋ Cʜᴀʀᴀᴄᴛᴇʀɪᴢᴀᴛɪᴏɴ: Rɪsᴋ Assᴇssᴍᴇɴᴛ Mᴇᴛʜᴏᴅᴏʟᴏɢʏ (2018), https://www.rand.org/content/dam/rand/pubs/research_reports/RR2100/RR2140/RAND_RR2140.pdf..................................................................................... 18

*Star Wars: Return of the Jedi* (1983) ........................................................................ 31

## PRELIMINARY STATEMENT

The 2015 Strategic National Risk Assessment Findings, Working Papers, Technical Appendix, and other documentation (collectively, the "SNRA") is the Federal Emergency Management Agency ("FEMA")'s and, by extension, the nation's, most comprehensive collection of information on the many risks facing the United States. It is a plenary literature review of all of the best available information from publicly available sources concerning the propensity and scope of a vast array of calamities, and was assembled by a talented team of experts.

Plaintiff filed this action against Defendant alleging that FEMA violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in connection with Plaintiff's September 1, 2017 request for the SNRA. Defendant produced 716 pages of materials in response to Plaintiff's FOIA request, redacting large portions under FOIA's Exemption 5, which incorporates the common law deliberative process privilege. Declaration of Paula Dinerstein, Exhibit A (hereinafter "Production"). FEMA has openly acknowledged the validity of the work it performed in the 2015 SNRA.  While FEMA claims it was never finalized, it is clearly an operative document that has been repeatedly cited as the factual justification for the various National Planning Frameworks, as recently as 2018.[1] FEMA promotes work product based on the SNRA to the public and Congress while concealing the facts and reference materials which justify them. The agency is telling us that risks exist, and asserting concomitant

---

[1] There are five National Planning Frameworks, one for each of FEMA's five mission areas: Prevention, Protection, Mitigation, Response, and Recovery. *See* FED. EMERG. MANAGEMENT AGENCY, NATIONAL PLANNING FRAMEWORKS (Jan. 30, 2019), https://www.fema.gov/national-planning-frameworks.

planning strategies, but the only evidence presented is "believe me." The secrecy that FEMA has sought in this matter fulfills James Madison's warning that "[a] popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." *Letter from James Madison to W.T. Barry* (Aug. 4, 1822), in 9 THE WRITINGS OF JAMES MADISON 103 (Gaillard Hunt ed., 1910); *see Standing in the Way of Judicial Review: Assertion of the Deliberative Process Privilege in APA Cases*, 53 ST. LOUIS L.J. 349 (2009).

This case is not a typical FOIA challenge in which an agency is fighting to protect politically sensitive or embarrassing materials from making attention-grabbing headlines. PEER is asking the Department to make public one of its greatest achievements and make a substantial contribution to the sum of knowledge that decisionmakers at every level of government need to protect the nation, and that citizens need to understand the risks they face and the basis for their government's decisions on how to address them. There is no national security exemption asserted, only the sensitivity of deliberations, but there is no risk that the reputations of the authors, the Department, or the decisionmaking process will be harmed. The only risk is that the Department fails to publicize one of its greatest tools "to empower people and the communities they live in to be prepared for any hazard." Stainsby Decl. ¶ 3.

## ARGUMENT

In FOIA contexts, the normal summary judgment standard where the moving party has the burden of proof is modified to reflect the information disparities inherent in litigation over the release of information that the government has, but the

plaintiff has not seen.[2]  The FOIA statute provides that the government has the burden of proof to justify any withholdings. 5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action."). Summary judgment can be granted based on agency affidavits only where they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). This modification to the summary judgment standard is warranted because "the threshold question in any FOIA suit is whether the requester can even see the documents the character of which determines whether they can be released." *Cooper Cameron Corp. v. U.S. Dep't of Labor, OSHA*, 280 F.3d 539, 543 (5th Cir. 2002).

"Accordingly, the FOIA statute provides that, when the Government withholds information from disclosure, the agency has the burden to prove *de novo* that the information is exempt from disclosure." *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010). This structural disparity underlies the rule that "conclusory and generalized assertions are not enough" to sustain summary judgment. *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999).

The government's burden was further heightened by the 2016 FOIA Improvements Act. *See* Pub. L. No. 114-185, 130 Stat. 538 (codified at 5 U.S.C. § 552). Among other amendments, the Act added the requirement that an agency can

---

[2] In general, summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

withhold information *only* if it "reasonably foresees that disclosure would harm an interest protected" by the claimed exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). This heightened standard for withholdings precludes "agency rel[iance] on the technical application of an exemption, it must now identify a precise reason why the disclosure of a specific record would harm the interests protected by, in this case, the deliberative process privilege." *Cause of Action Inst. v. United States DOJ*, 330 F. Supp. 3d 336, 354-55 (D.D.C. 2018).

While there is not yet much case law applying the 2016 amendment, two additional cases emphasize strict application of the "foreseeable harm" standard: *Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62 (D.D.C. 2018), and *Ecological Rights Found. v. FEMA*, No. 16-cv-05254, 2017 U.S. Dist. LEXIS 197451, 2017 WL 5972702 (N.D. Cal. Nov. 30, 2017). *Rosenberg* adopted the *Ecological Rights Foundation* court's "insistence on strict compliance with the FOIA Improvement Act" in this District. 342 F. Supp. 3d 62, 78. It held that an agency "must explain how a particular Exemption 5 withholding would harm the agency's deliberative process." *Id*. An agency "may take a categorical approach—that is, group together like records—but in that case, it must explain the foreseeable harm of disclosure for each category." *Id*. Such an explanation "must do more than perfunctorily state that disclosure of all the withheld information—regardless of category or substance— would jeopardize the free exchange of information between senior leaders within and outside of the [agency]." *Id.* at 79. The opacity of an affidavit explanation may prevent the court from adequately applying the substantive tests. See *Morley v. CIA*, 508 F.3d 1108, 1126-27 (D.C. Cir. 2007). While the level of specificity required is a matter of

judicial discretion, "it is enough to observe that where no factual support is provided for an *essential* element of the claimed privilege or shield, the label 'conclusory' is surely apt." *Senate of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (emphasis in original).

In this case, the assertions by the agency are just the kind of bare assertions of the statutory standards which the FOIA Improvements Act sought to eliminate. The declarants themselves may lack the capacity to provide more. While the admissibility of Defendant's declarations is not challenged, their evidentiary value bears scrutiny. Gregory Bridges joined FEMA on August 21, 2018, after all three stages of the production were completed on June 25, 2018. Bridges Decl. ¶ 1. He became Acting Chief of the Disclosure Branch at FEMA on February 18, 2019, a mere 11 days before his declaration was filed. Similarly, Leiloni Stainsby has only held her position as Acting Director for the National Preparedness Directorate since July 2018, which also postdates all three productions. Stainsby Decl. ¶ 1. While Stainsby has been "with the Department [of Homeland Security]" since November 2011, and may have been involved in the creation of the SNRA, it is unclear from Defendant's motion papers what her personal knowledge of the SNRA process is based on.

## I.   THE DELIBERATIVE PROCESS PRIVILEGE IS NOT APPLICABLE TO THE WITHHELD MATERIALS

Assertion of Exemption 5 requires an agency to demonstrate that a document is both predecisional and deliberative. *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). It must also demonstrate that "disclosure would harm an interest protected by" Exemption 5. 5 U.S.C. § 552(a)(8)(A)(i)(I). "Both requirements stem from the privilege's 'ultimate purpose[, which] . . . is to prevent injury to the quality of agency

decisions' by allowing government officials freedom to debate alternative approaches in private." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) (alterations in original)).

It is "beyond dispute" that the deliberative process grounds for Exemption 5 withholdings do *not* protect "[u]nevaluated factual reports or summaries of past administrative determinations . . . used by decisionmakers in coming to a determination." *Vaughn*, 523 F.2d at 1143. Sensitive "deliberative or policymaking processes" are protected, while "purely factual, investigative matters" are not. *EPA v. Mink*, 410 U.S. 73, 89 (1973). "To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment.*" *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (citation omitted; emphasis in original). The privilege "is centrally concerned with protecting the process by which *policy* is formulated." *Id.* (emphasis in original).

Purely factual materials are not shielded unless "the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d at 737. Ultimately the standard to determine whether a document is both "predecisional" and "deliberative" is "whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Under the FOIA Improvements Act of 2016, a demonstration of reasonably foreseeable harm from disclosure should be made for each withholding.

Even if the withheld documents were found to be both predecisional and deliberative, FEMA does not meet the requirement that their disclosure would create foreseeable harm to the deliberative process. The version of the SNRA which Plaintiff requested is a completed document which all persons involved *expected to be made public*. This is explicit in the unredacted cover letter for the SNRA Findings, which explains to the reader "[t]he following represents a *fully adjudicated draft* of the 2015 Strategic National Risk Assessment (SNRA) Findings document." Production at 000070 (emphasis added). After a redacted paragraph the page continues "[t]he 2015 SNRA supporting documentation which substantiates the 2015 SNRA Findings is also being provided." *Id*. An unredacted release could not chill the free and frank discussion of those who created them, because the internal deliberations were already "fully adjudicated." *Id*.

It is in all but name a final document, and has been relied upon by the agency in subsequent materials and communications with Congress. For example, at a roundtable discussion hosted by the Government Accountability Office ("GAO") on February 27, 2019, GAO Acting Director Nathan Anderson summarized three reports it had issued from 2016-2019 on electromagnetic threats. Acting Director Anderson explained that GAO's recommendation to DHS that it work with federal and industry partners to collect and analyze information on risk was implemented by FEMA's completion of the 2015 update to the SNRA: "In June 2016, DHS reported that the department completed the planned refresh of the Strategic National Risk Assessment, which incorporated information on potential impacts to the power system from electromagnetic events." Nathan Anderson, GAO, *Electromagnetic Events Roundtable*

*Discussion: Key GAO Findings and Recommendations* (Feb. 27, 2019), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Anderson-2019-02-27.pdf (discussing GAO-16-243 ELECTROMAGNETIC THREATS 20 (2016)).

Even according to FEMA, the document was final but for approvals from officials outside of the process of creating it. Plaintiff is not attempting to wrest candid emails or meeting notes of heated debates on climate change, the threat of right-wing extremism, or forest management. These are the sorts of deliberations that Exemption 5 and the deliberative process privilege can and should protect so that politically sensitive topics can be discussed without fear of public exposure or reprisal. The SNRA Findings also emphasize that "the assessment treated impact categories separately (e.g. economic impacts are reported separately from fatality impacts). This allowed stakeholders to apply their own expert judgments to the findings and decide how those findings should inform core capabilities in the Goal." Production at 000084. Clearly the deliberative process was completed by the time this document was created.

When faced with close calls on the deliberative nature of withheld materials, "resort to the purposes underlying the deliberative-process privilege clears away any misgivings." *Cause of Action Inst.*, 330 F. Supp. 3d at 354. The privilege serves three purposes:

> (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before finally they are adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationale that were not in fact ultimately the grounds for an agency's action.

*Citizens for Responsibility & Ethics in Washington v. Nat'l Archives & Records Admin.*, 583 F. Supp. 2d 146, 156 (D.D.C. 2008). Asserting the deliberative process privilege for all materials "that relate[] in some way to an agency's predecisional correspondence would fly in the face of the general directive that the Act's exemptions be 'narrowly construed.'" *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (citations omitted).

A.    THE WITHHELD DOCUMENTS ARE NOT PREDECISIONAL

Documents are only protected from disclosure under Exemption 5 where they expose agency deliberations preceding a particular policy decision or that were part of a deliberative process concerning a potential policy decision, in such a way that agency staff would be less likely to candidly express opinions amongst themselves. A document is only predecisional if was created "[a]ntecedent to the adoption of an agency policy." *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774, (D.C. Cir. 1978). The court must "be able to pinpoint an agency decision or policy to which these documents contributed." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983) (citing *EPA v. Mink*, 410 U.S. 73, 89-91 (1973)), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984).

To determine whether a document is predecisional, the agency's administrative process must be examined, as well as the document's role in that process. *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 172-79 (1975) (examining role of reports of facts and recommendations prepared by regional staff of the Renegotiation Board in deciding whether certain Government contractors have earned, and must refund, "excessive profits" on their Government

contracts); *Playboy Enters., Inc. v. Dep't of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982) ("the deliberative process privilege is dependent upon the individual document and the role it plays in the administrative process").

In this case there was no ultimate *policy* decision, or even a process of formulating a policy, which disclosure of the SNRA might harm. There has been no showing that the SNRA contained specific policy recommendations or led to any policy decision. Moreover, FEMA makes clear that the SNRA was intended to be a stand-alone document to be publicly released to aid communities in emergency planning, and therefore was not merely a pre-decisional document feeding into any purported policy process. *See* Production 000069 ("the nation's preparedness is dependent upon whole community partners understanding the risks"); Stainsby Decl. at ¶ 3. Furthermore, the findings of the 2015 SNRA were intended to "be summarized for public dissemination," and the full documentation of the 2015 SNRA was meant to be "closely scrutinized by responsible leadership, reviewers in the U.S. risk science and policy communities, and state, local, tribal, and territorial planners and emergency managers." Production 000011. This was not a deliberative document, but one intended to be utilized by policymakers and planners outside the federal government.

FEMA appears to claim that the SNRA was pre-decisional to the 2015 National Preparedness Goal, but also somewhat contradictorily that it was pre-decisional to itself because it was a draft that never received final approval, even though it was subsequently relied on in published FEMA documents.  The court should find that the requested documents are not pre-decisional because they are sufficiently "final" to be

released, or alternately that there is no final "policy" decision to which the SNRA is pre-decisional. The agency cannot simultaneously claim on the one hand that the SNRA is pre-decisional because it was never finalized and thus remained inchoate and ineffective, and on the other that it was pre-decisional because it was employed as the "analytical foundation" of the final published National Preparedness Goal and the Planning Frameworks. Stainsby Decl. at ¶3. While the materials may never have received approval from the Secretary of Homeland Security, they are "a fully adjudicated draft." Production at 000070 (emphasis added).

In addition, FEMA's declarant has not shown that, as claimed, she actually has personal knowledge of the process of creating the SNRA documents or how they fit into FEMA's decisionmaking processes. Stainsby Decl. ¶ 2. Thus, she cannot attest to the documents being pre-decisional or deliberative. According to the Stainsby Declaration, in the process of developing the SNRA, "the NIC forwarded the SNRA Documents to several offices[3] throughout FEMA for review, including my office, the National Preparedness Assessment Division." This means that the declarant was only a side player during the development of the SNRA and has no personal knowledge of how it was reviewed or discussed in other offices or agencies. Stainsby continues "[t]o *my knowledge*, the NIC did not send the SNRA Documents through the formal concurrence process and NPD leadership did not approve them." Stainsby Decl. ¶ 6 (emphasis added). She does not exclude the very plausible possibility, given her role, that this could have occurred without her knowledge.   While the Bridges Declaration

---

[3] "FEMA's Office of External Affairs, Office of Chief Counsel, National Preparedness Directorate, and Office of Response and Recovery" (footnote in original)

states that those documents could not "become final without formal federal interagency concurrence and senior-level White House approval," Bridges Decl. ¶ 10, it is not clear what this really means or how it squares with the reliance on these documents in official agency publications.  Nor does either declaration provide any details of the concurrence and approval process or cite to any agency policy or regulations implementing it.

Defendant asserts that these materials are predecisional "given that none of the documents ever received final approval by those responsible for giving such approval" without defining "those responsible" or the form which approval had to take. Def's Br. at 4. Defendant states that "the decisionmaking process concluded without any final decision or finalized documents;" however there is nothing in the record to indicate what the process was or that it actually concluded or how or why. *Id*., at 5. This also contradicts the assertion that the document was "generated as part of a continuing process of agency decisionmaking," *id*. at 4, because a concluded decisionmaking process is by definition no longer continuing.

The *Vaughn* Index contains precious little information about the predecisional nature of the withholdings. Multiple documents are withheld on the basis of a single boilerplate and conclusory justification, that "This document is a draft and didn't complete the review process in order to be finalized." Docket No 23-2 at 1, 3-4, 6, 7, 24, 37 (*hereinafter* "Index" or "Vaughn Index"). The agency relies on this statement to withhold all "differences between the 2011 SNRA and the draft 2015 SNRA Findings document." *Id*.  The alleged harm is that disclosure would "would discourage the expression of candid opinions and inhibit the free and frank exchange of information

among agency personnel." *Id.* There is no more particularized reasoning for any individual withholding, only one-line descriptions of withheld information. One of the withholdings is from the table of contents of the SNRA Technical Appendix: every entry under "New and/or Updated Risk Summary Sheets" has been redacted, along with the text of those pages. Production 000114. It is not explained how disclosure of even the *subjects* of the Risk Summary Sheets, let alone their contents, "would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel." Index at 1, 3-4, 6, 7, 24, 37. This is particularly spurious reasoning when the Summary Sheet authors (who are unnamed) were told in advance that "[d]ata providers should expect that the risk summary sheets documenting the source data and analysis supporting their top level estimates will be scrutinized by the public, experts in the U.S. risk technical community, and state, local, tribal, and territorial planners and emergency managers." Production 000012.

"What constitutes a 'reasonable' level of specificity in a *Vaughn* affidavit varies depending on the particular context, and specifically, which exemption is being invoked. *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018) (internal quotations omitted). "*Vaughn* submissions are insufficient, however, where 'the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping.'" *Id.* (quoting *Quinon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1227 (D.C. Cir. 1996). In this case, every stage of the analysis which Plaintiff and the Court must undertake to determine whether the withholdings comply with Exemption 5 is impeded by the boilerplate nature of the agency's affidavits. While the

*Vaughn* Index itemizes all of the hundreds of redactions made across almost every page of the production, its reasoning is monolithic and does little more than recite the standard:

> This document is a draft and didn't complete the review process in order to be finalized. The withheld information contains factual information that is so entangled with the analyses and conclusions that release would reveal specific threats and hazards which are pre-decisional and part of the deliberative process, and may not reflect FEMA's current position regarding risks. Disclosure of this deliberative and pre-decisional information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

Index at 1, 3, 4, 6, 7, 24, 37. This explanation does not jive with the cover sheet in the production, which explains that the enclosed "represents a *fully adjudicated draft* of the 2015 Strategic National Risk Assessment (SNRA) Findings document." Production at 000070 (emphasis added). No attempt is made to explain how disclosure of this fully adjudicated technical documentation could chill candid expression between the experts at FEMA.

A comparable *Vaughn* Index was presented in *Morley v. Central Intelligence Agency*, 508 F.3d 1108 (D.C. Cir. 2007). In that case the CIA provided a *Vaughn* Index and declaration supporting it with only "minimal information" that "provide[d] the court with no way of knowing if the CIA has properly applied [Exemption 5] in exempting material from the two records identified." *Id.* at 1127.[4] The Agency also "provided no hint of a final agency policy its 'predecisional' material preceded." *Id.*

---

[4] The provided information was more robust than FEMA's in this case. The CIA informed the court that "recommendations - concerning the waiver of certain reinvestigation methods" were being withheld under Exemption 5, whereas FEMA has only stated that the factual materials withheld were culled from a larger set of facts by agency analysts.

The included declaration from the agency must provide "factual support" for the claim that the decisionmaking process would be harmed by release and at least a basic description of why an employee would be less likely to provide accurate information in a fully adjudicated draft report that only lacked political approval. *Id.* (citing *Senate of Puerto Rico ex rel. Judiciary Comm. v. United States DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987)).

> B.      THE WITHHELD DOCUMENTS ARE NOT DELIBERATIVE

> 1.      The Withheld Documents Do Not Involve Policy Discussions

Even assuming the agency met its burden to show that the withheld material is predecisional, it has not met its burden to prove that it is deliberative. "A record is not protected merely by virtue of being a relevant predecisional communication." *Cause of Action Inst. v. United States DOJ*, 330 F. Supp. 3d 336, 353-54 (D.D.C. 2018) (citing *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 158-59 (D.D.C. 2009) (requiring disclosure of redactions in which "no agency  policy is being debated or discussed" even though the "redactions are, in the most general sense, part of an intra-agency discussion relating" to agency's response to media inquiry).  A document is deliberative when it "makes recommendations or expresses opinions on *legal or policy matters*." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) (emphasis added).  The anemic explanations in the declarations and Vaughn Index here do not demonstrate that these requirements are met.

Instead, FEMA relies mainly on its claim that the 2015 SNRA is  a nonfinal draft. However, "[e]ven if a document is a draft of what will become a final document, the court must also ascertain whether the document is deliberative in nature." *Arthur*

*Andersen & Co* v. *IRS,* 679 F.2d 254, 257-58 (D.C. Cir. 1982) (internal quotation marks omitted).   Thus, draft documents are neither *per se* exempt nor presumptively privileged.   *Judicial Watch, Inc. v. U.S. Postal Serv.,* 297 F.Supp.2d 252, 261 (D.D.C. 2004) (citing *Arthur Andersen,* 679 F.2d at 257 and *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261-62, (D.C. Cir. 1977)); *see also Conservation Force* v. *Jewell*, 66 F. Supp. 3d 46, 60 (D.D.C. 2014) (draft designation alone does not establish that any document is predecisional and deliberative).   Drafts which do not reflect "an agency's preliminary positions or ruminations about a particular policy judgment" are not deliberative. *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 37 (D.D.C. 2006) (quoting *Nat'l Assoc. of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002) (internal quotation marks omitted)).   The withheld documents here are not "preliminary positions or ruminations," since the documents have been used to support official agency publications, and they have not been shown to be about policy judgments.

FEMA claims that these documents are deliberative "because they consist of proposed factual findings, proposed assessments of information pertaining to threats and hazards, and other opinions, recommendations, and proposed conclusions made by the authors." Bridges Decl. ¶ 11;, Deft. Br. at 5  However, there is no showing that any or all of such material involves policy discussions or "bear[s] on the formulation or exercise of agency policy-oriented *judgment*" required to meet the requirements of the FOIA exemption. *Petroleum Info. Corp.*, 976 F.2d at 1435.

On the contrary, the production itself makes clear that the SNRA is a factual tool to be generally available to any number of decisionmakers to assist in any kind

of decision. *See* Production 000069 ("the nation's preparedness is dependent upon whole community partners understanding the risks"). The documents explicitly state that "[n]o effort was made to create a single 'risk judgment' for any event type," which "allows stakeholders to apply their own expert judgments to the findings." Production 000058. Furthermore, the findings of the 2015 SNRA were intended to "be summarized for public dissemination," and the full documentation of the 2015 SNRA was meant to be "closely scrutinized by responsible leadership, reviewers in the U.S. risk science and policy communities, and state, local, tribal, and territorial planners and emergency managers." Production 000011. To comply with FEMA's Scientific Integrity and Information Quality policies, the 2015 SNRA "rel[ied] upon the peer and public review requirements of these standards as the primary means to ensure quality control." Production 000011. The agency has decisively failed to meet its burden of proof.

While the SNRA did not itself discuss *policy* conclusions or recommendations, its plenary literature review and body of factual information have been cited by FEMA or DHS on a number of occasions.[5] The Government Accountability Office ("GAO") has also cited the SNRA as a source of information regarding threats the nation faces from Electromagnetic Pulse (EMP) weaponry, a threat not appearing in the 2011 edition of the SNRA. *See* GAO-16-243 ELECTROMAGNETIC THREATS 20 (2016). The broad range of

---

[5] DHS, NATIONAL PREVENTION FRAMEWORK, SECOND EDITION 4 (2016) ("Results of the Strategic National Risk Assessment (SNRA), contained in the second edition of the National Preparedness Goal, indicate that a wide range of threats and hazards continue to pose a significant risk to the Nation"); *id.* at 23-25 (listing planning considerations specific to terrorist threats identified by the SNRA); DHS, NATIONAL MITIGATION FRAMEWORK, SECOND EDITION 6 (2016) (citing SNRA as evidence of ongoing threats in National Preparedness Goal); DHS, NATIONAL RESPONSE FRAMEWORK, THIRD EDITION 7 (2016).

subsequent publications by DHS and others which have gleaned factual information from the 2015 SNRA suggest that it does not contain specific policy stances, but general information which can and should be used by a broad audience.

The 2015 SNRA also forms the core of the agency's current thinking as reflected in a 2018 report prepared for DHS by the RAND Corporation. In 2016, DHS's Office of Policy—Strategy, Plans, Analysis, and Risk (SPAR) asked the RAND National Defense Research Institute (NDRI) to design and implement a homeland security national risk assessment to help inform DHS strategic planning by identifying and characterizing natural hazards and threats to the nation. *See* RAND CORP., HOMELAND SECURITY NATIONAL RISK CHARACTERIZATION: RISK ASSESSMENT METHODOLOGY (2018), https://www.rand.org/content/dam/rand/pubs/research_reports/RR2100/RR2140/RAND_RR2140.pdf (preface). The report that RAND produced in 2018:

> drew on the 2011 Strategic National Risk Assessment (SNRA) documentation files held by DHS Policy (DHS, Office of Policy, no date), an overview briefing of the 2012 HSNRC (DHS, 2014a), the 2015 SNRA results that built on the prior analyses (DHS, 2014b), and the 2014 Flows study conducted in support of the 2014 QHSR (DHS, no date).

*Id.* RAND's report used "[t]he 2015 SNRA [a]s the starting point for data collection" which "[i]n some cases, such as the assessment of natural disaster hazards, . . . ultimately provided as many as half the citations used in the final risk characterization." *Id*. at 34. Not only has the SNRA been relied upon by DHS and its contractors in generating current threat assessments, thus reflecting FEMA's current position regarding risks.

Even assuming (contrary to fact) that the SNRA did contain policy-oriented judgments, "a document that is predecisional at the time of preparation may lose

exempt status if 'adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.'" *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981) (quoting *Coastal States*, 617 F.2d at 866; citing *Sears*, 421 U.S. at 161). While the rule against secret agency law expressed in *Sears* deals with legal memoranda which are withheld by agencies as deliberative, "where an underlying memorandum is expressly relied on in a final agency dispositional document, even though only part of it is expressly reproduced, . . . a presumption in favor of disclosability of the memorandum as a whole is created." *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967, 973 (7th Cir. 1977) (adopted in D.C. by *Judicial Watch, Inc. v. United States Dep't of Defense*, 2016 U.S. Dist. LEXIS 11872 (D.D.C. 2016). Here, the SNRA has been explicitly referenced and its conclusions adopted in subsequent FEMA and DHS public documents, and therefore has lost any exempt status it may have had. The SNRA should be produced in full.

> 2.     There Is No Foreseeable Harm Because There Are No Deliberations to Chill by Disclosure.

A document is deliberative when it "makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). For a document to be "deliberative" requires it to "reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). "To test whether disclosure of a document is likely to adversely affect the purposes of the privilege, courts ask themselves whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency; 'Human experience teaches that those who expect public dissemination of

their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.'" *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)).

The concern about tempered candor which lies at the heart of deliberative privilege jurisprudence is absent in this case. It bears repeating that the material requested by FOIA "represents a fully adjudicated draft of the 2015 Strategic National Risk Assessment." Production at 000070. An unredacted release could not chill the free and frank discussion of those who created it, because the internal deliberations took place prior to the creation of this draft.

The only analysis of the potential harm to the interests protected by Exemption 5 by the release of the redacted material in Ms. Stainsby's Declaration is the following block quote, which is repeated almost verbatim six times by Ms. Stainsby in reference to each withholding:

> This document contains data and factual information that is so entangled with the analyses and conclusions that release would reveal specific threats and hazards which are pre-decisional and part of the deliberative process, and may not reflect FEMA's current position regarding the risks and their impacts on the United States. Disclosure of this deliberative and pre-decisional information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel.

See Stainsby Decl. ¶ 6, 8, 10, 14, 16, 18. It makes no sense for the agency to withhold "data and factual information" because it is "entangled [with] analyses and conclusions," but not withhold, or even identify, the purported analyses and conclusions themselves.   In addition, "specific threats and hazards" cannot themselves be "predecisional."   Apart from not applying the exemption to specific withheld material as required, this boilerplate response does not reveal any actual

deliberations that should be protected or whose disclosure would cause harm to the agency, or how and why such harm would occur.

The only additional support for any foreseeable harm from disclosure is the agency's statements that release "may cause confusion to the public as to the actual threats and hazards perceived by FEMA and the agencies with which it consults," *see* Def.'s Statement of Material Facts ¶ 8; Def.'s Br. 6; Bridges Decl. ¶ 12; which is equally hollow, conclusory, and contradicted by the agency's public reliance on the withheld material. *See* n. 5, *supra*.

The core concerns of the deliberative process privilege are only raised by Defendant in passing by the boilerplate justifications of the *Vaughn* Index. Not only has Defendant failed to meet its burden to show harm from release, but it is unreasonable to conclude that there are any sensitive deliberations in unreleased final drafts which have passed the adjudicative process and whose anonymous authors knew in advance they would be made public. Further, as a factual document whose undisclosed findings are repeatedly relied upon by the agency and its contractors, it is clear that the publication of the SNRA will not confuse the public as to FEMA's position on which threats to America bear concern. The scientific facts relied on in 2014 and 2015 when the SNRA was drafted have not changed so much. Because there is no possible injury to the integrity of the agency's deliberative processes, the 2015 SNRA should be released in full.

> 3.  That the Factual Material was Culled from a Larger Set of Facts Does Not Make it Deliberative or Provide Grounds to Withhold Production.

Defendant argues that it can withhold even purely factual material in the withheld documents. Factual material normally must be disclosed even if the rest of the document is deliberative. *See e.g. EPA v. Mink*, 410 U.S. at 89. Defendant argues that the factual material in the SNRA should be withheld regardless because the material "is included in documents through the exercise of judgment calls requiring extracting facts from a larger set of facts." Def's Br. at 5. The SNRA allegedly and "represents the judgment of what the authors thought were pertinent facts but might not be thought of as pertinent by any FEMA official with authority to finalize these documents." Def's Br. at 5-6; Bridges Decl. ¶ 10-11. This claim, while critical to the agency's argument, is not further explained, and is impossible for Plaintiff to evaluate. Senior FEMA officials with the authority to finalize these documents have relied on their information, confirming that the facts selected by the SNRA authors are still thought of as pertinent. *See* Section A.2, *supra* (discussion of citations to SNRA from 2016-18). There is no evidence that any part of the SNRA was rejected or superseded by the agency, and the use of its conclusions by the agency and its contractors up to the present time indicates otherwise.

The "culling of facts" argument is also impossible to evaluate given the minimal explanation given by the agency. While there is a limited exception to the rule that purely factual information is not protected by the deliberative process privilege, its scope is not so broad as to encompass *any* selection of facts. "Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material." *Playboy Enters., Inc.*

22

*v. Dep't of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982). Some more detailed explanation of how the factual material is quintessentially "deliberative" must be provided. Nevertheless, Defendant conclusorily claims that disclosure of the facts which were relied upon, including even the references in the footnotes, will irreparably harm the deliberative process within FEMA.

The National Transportation Safety Board was not availed by a similar argument in *Lahr v. NTSB*, 453 F. Supp. 2d 1153 (C.D. Cal. 2006). In that case, the NTSB argued that the "selection of these data culled from hundreds of pages of data give an indication of the preliminary thoughts of how data may be used in the simulation program." *Id.* at 1187. The argument was "essentially . . . that the release of this data, would reveal the deliberative process, because some staff member selected *this* specific data for a reason." *Id.* (emphasis in original). The NTSB also argued, as FEMA does here, that "without the protection provided by the exemption, full and frank discussion of options and opinions so vital to the decision-makers would be impossible." *Id.* (quoting agency declarations). The *Lahr* court rejected this explanation as "only tautological support for this proposition, not an explanation or description of the communicative or evaluative procedures the NTSB followed in doing its 'culling.'" *Id.* The court ruled that:

> the agency must show that the deliberative process (or at least part of it) can be determined from the data alone. Thus, for example, information about how data was evaluated, by whom, and how differing views or results were communicated within the investigative team might have established a stronger basis for defendants' claim of exemption.
>
> Defendants have failed to carry their burden that what has been withheld "represent[ed] the mental processes of the agency in considering alternative courses of action prior to settling on a final

> plan." *Nat'l Wildlife Fed'n,* 861 F.2d at 1122. *Defendants' contention*
> *would invite agencies to claim that the mere notion that one set of facts*
> *was culled from a larger set of facts always and necessarily renders the*
> *culled material evidence of the agency's deliberative process.*

*Id.* (emphasis added). FEMA's boilerplate claim that "the Bridges Declaration makes

clear that the factual information here was culled from a larger set of facts" is

precisely the outcome that *Lahr* was afraid of. Deft. Br. at 6. It is conclusory because

it does not describe what the larger set of facts was, how the information was culled,

for what purpose, or by whom. No details are provided. It is tautological because any

"set" of facts is by definition "culled" from a larger set of facts. Court rules against the

introduction of irrelevant evidence, for example, accept this as a given: *any* factual

record will necessarily cull irrelevant facts. In this instance, FEMA will not even

provide references to public documents contained in the production, presumably

because the references were "culled" from the universe of potentially relevant

publications in an earlier stage of the drafting of the SNRA.[6]

Other cases cited by Defendant allowing withholding of factual material are

inapplicable. *Mapother v. Dep't of Justice*, 3 F.3d 1533 (D.C. Cir. 1993), built on prior

cases that justified withholding drafts of agency work product because releasing both

a draft *and* a final public version could reveal which facts the agency decided to

include or exclude at which stage of a document's development:

> In *Russell v. Department of the Air Force,* 682 F.2d 1045 (D.C. Cir. 1982),
> and again in *Dudman Communications Corp. v. Department of the Air*
> *Force,* 815 F.2d 1565 (D.C. Cir. 1987), we shielded from disclosure draft
> versions of official Air Force histories. Each history covered certain Air
> Force operations conducted during the Vietnam War and was produced

---

[6] The *Vaugn* Index attached to the Bridges Declaration contains 429 redactions of "reference"
information, predominantly footnotes.

> to inform future policy decisions. *Russell,* 682 F.2d at 1046, 1047;
> *Dudman Communications,* 815 F.2d at 1566. In *Russell,* we reasoned
> that "disclosure of the material sought … would reveal the Air Force's
> deliberative process" because "a simple comparison between the pages
> sought and the [final, published] document would reveal what material
> supplied by subordinates senior officials judged appropriate for the
> history and what material they judged inappropriate." 682 F.2d at
> 1049; *see also Dudman Communications,* 815 F.2d at 1569 (reaffirming
> *Russell*'s rationale)."

3 F.3d at 1538. Here there is no final version to compare the draft to, and only one draft is at stake. Furthermore, FEMA's full disclosure of the STRATEGIC NATIONAL RISK ASSESSMENT 2015 UPDATE: BACKGROUND & GENERAL GUIDANCE, STRATEGIC NATIONAL RISK ASSESSMENT 2015 QUALITATIVE DATA INSTRUCTIONS, and STRATEGIC NATIONAL RISK ASSESSMENT 2015 RISK SUMMARY SHEET INSTRUCTIONS AND TEMPLATE (collectively hereinafter "Guidance") has already caused whatever attenuated harm to decisionmaking processes which FEMA has alleged. *See infra* this section.

*Mapother* itself dealt with fact summaries prepared to assist a specific decisionmaker with "the making of a discretionary decision." 3 F.3d at 1539. The SNRA, while a factual "summary" of a number of threats, is not the kind of special-use fact memo intended to inform a specific discretionary decision that *Mapother* withheld. That case was about specific evidence compiled by the Department of Justice for the Attorney General to determine that a certain individual should be barred from entering the United States because his prior history indicated he was a Nazi.[7] What specific acts were committed by the individual, which sources of

---

[7] "The Report is a 204-page document prepared for the Attorney General by the Office of Special Investigations, a unit within the Justice Department's Criminal Division, that details the wartime activities of Kurt Waldheim, the former Secretary-General of the United Nations and former President

information might be considered, the means by which an investigation was conducted, and other sensitive issues would be implicated by disclosure.

Similarly, in *Ancient Coin Collectors Guild v. United States Dep't of State*, a case concerning reports relating to import restrictions on cultural artifacts from China, Italy, and Cyprus, the "factual summaries . . . reflect an 'exercise of judgment as to what *issues* are most relevant to the predecisional *findings and recommendations*.'" 641 F.3d 504, 513-14 (2011) (emphasis added). Those judgments included "lists of events selected to show whether a given type of item has been pillaged," the disclosure of which would harm agency decisionmaking by, *e.g.*, indicating to the public which coin collecting events drew scrutiny as bellwethers for determination that artifacts had been pillaged. *Id*.

The language from *Ancient Coin Collectors* relied upon by Defendant, that "the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process," is thus highly contingent. *Id*. First there must be a deliberative process, and second, specific aspects of the decisionmaking process must be impacted in specific ways. The factual "culling" in this case is solely from public unclassified documents and concerns a very broad array of risks and harms not specific to any decisionmaker or decision.

---

of Austria. It provided the basis for an order issued by the Attorney General barring Mr. Waldheim from entering the United States because of evidence that he may have participated in war crimes as an officer in the army of Nazi Germany." *Mapother*, 3 F.3d at 1535.

Ironically, the only possible "deliberative" material, which reveals how the agency selects facts to use in the SNRA, was disclosed in full.  The Guidance for FEMA analysts to follow when making factual selections was produced without redaction. Production 1-43. It discloses essentially the entire deliberative process by laying out the steps which analysts followed in preparing the SNRA. The only new information Plaintiffs could glean about the decisionmaking process from production of the withheld material might be whether and how well the agency's employees followed those instructions -- which would not be a revelation of any policy-making process. The Guidance instructs FEMA analysts on how to choose data that will be "representative of likely U.S. conditions in the next 3-5 years." *See* Guidance, at 12, 000021.[8] Where the selection of factual material is conducted "because it is a representative of the whole, [and] not because it holds significant differences that bear on the agency's deliberative process," it should not be withheld. *Cause of Action Inst. v. United States Dep't of Justice*, 330 F.  3d 336, 354 (D.D.C. 2018).

The information withheld was, according to the Guidance, selected precisely because it is representative of the literature base for each risk. Nothing in the agency's declarations supports a finding that the factual material withheld here is part of a deliberative process subject to Exemption 5.

## II.     SEGREGABILITY

Where documents are not withheld in their entirety under an Exemption to FOIA, "if the government can segregate and disclose non-privileged factual

---

[8] Discussion of representative data sampling appears throughout the Guidance, but specific examples can be found at pages Bates stamped 000019-21, 25, 28, and 36-38,

information within a document, it must." *Loving v. Dep't of Defense*, 550 F.3d 32, 38 (D.C. Cir. 2008). It is "undisputed" that "non-exempt information that is 'reasonably segregable' from exempt information must be disclosed." *Elec. Frontier Found. v. United States DOJ*, 739 F.3d 1, 12 (D.C. Cir. 2014) (citing 5 U.S.C. § 552(b)).

*Vaughn v. Rosen* involved government affidavits which "made no clear distinction . . . to enable the facts to be distinguished from the evaluative, interpretative, or final conclusions" of allegedly deliberative materials. 523 F.2d at 1144. A *Vaughn* Index is prepared to comply with its holding and reasoning that the government cannot "lump . . . facts, interpretation, evaluation, and recommendations - into one mass to be protected." *Id*. Even assuming that there is *any* pre-decisional, deliberative material in the withholdings, there is some withheld material that is so obviously not deliberative that it almost certainly indicates the "lumping together" of materials forbidden by *Vaughn*. Production 000114, 146-347.  For example, one block of redaction covers the individual table of contents entries for 31-232 of the SNRA Technical Appendix. Those pages, which also have their contents completely redacted, contain the New and/or Updated Risk Summary Sheets from the SNRA, the format of which is described in detail in the Guidance document. Production 000001, 000010-42.

Those summaries are the "quantitative evidence base" of the SNRA. Production 000012. They "typically include[] nice things to know about the threat/hazard like qualitative descriptions, overview, narrative, [and] potential mitigating factors." Production 000016. While there may be defined areas in which subject matter expert judgment is needed, there is no indication that *policy* judgment

or recommendations are made. And where they are made, "judgments in the SNRA *are made explicit* in a way that stakeholders, political leadership, and technical reviewers can scrutinize, and which are expressed in quantitative terms having the same, unambiguous meaning for all audiences." Production 000035. Even assuming those technical expert judgments are covered by the deliberative process, they are clearly distinct from any underlying raw evidence in the structure established for those pages, so there must be some purely factual material which can be produced.

Defendant's assertions of deliberative privilege appear to depend on whether the subject matter appeared in the 2011 SNRA or not. The sweeping redaction of all material that was not included in the 2011 SNRA, including even the table of contents, is incompatible with FOIA's requirement that the context matters. When making determinations about segregability, "the context in which factual statements were made in asserting that factual material cannot generally be withheld under the deliberative process privilege" is a core concern. *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 12 (D.C. Cir. 2014). The SNRA Guidance shows that there is plentiful factual information that could be extracted, at least including the table of contents, references, and the factual bases in the technical appendix. The most heavily redacted document is, ironically, the Technical Appendix which provides the *factual basis* for the findings of the SNRA. Production 112-716.

The Government is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (citations omitted). This presumption however "does not obviate its obligation to carry its evidentiary burden and fully explain its decisions on

segregability." *Cause of Action Inst. v. United States DOJ*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018) (citing *Mead Data Cent.*, , 566 F.2d at 261-62). To explain such decisions, the agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." *Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010); *see also Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (determining government affidavits explained nonsegregability of documents with "reasonable specificity").

Where it is not clear from the agency's affidavits whether all reasonably segregable information has been produced, "it will plainly be necessary and appropriate" to conduct *in camera* review of the withheld materials. *Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (citing S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 9 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6287). In this case, the affidavits presented by the agency plainly lack "specific information sufficient to place the documents within the exemption" or specific analysis as to why each exemption furthers the purpose of Exemption 5 over the public's interest in disclosure. *See* 2016 FOIA Improvements Act, Pub. L. No. 114-185, 130 Stat. 538 (codified at 5 U.S.C. § 552). "The burden is, of course, on the agency resisting disclosure, and if it fails to meet its burden without *in camera* inspection, the District Court may order such inspection." *EPA v. Mink*, 410 U.S. 73, 93 (1973). Because *in camera* review is time-consuming and burdensome for the court, this Court should instead grant summary judgment in favor of disclosure.

## CONCLUSION

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). FEMA is masking a fully adjudicated factual report behind the thin justification that it never received a political stamp of approval while continuing to rely on it in subsequent risk-based documents. In *Star Wars: Return of the Jedi* (1983), Emperor Palpatine presented the illusion that the second Death Star was a work in progress and incapable of defending itself, only to reveal when approached that it's a trap: it was a fully armed and operational battle station. Similarly, FEMA is hiding a fully armed and operational SNRA from FOIA as a predecisional draft while relying on the legitimacy of its analysis even today.

For the reasons articulated above, and to uphold the will of Congress in enacting FOIA and its amendments, Defendant's motion for summary judgment should be denied and Plaintiff's cross-motion for summary judgment should be granted as to all of the materials that the agency has wrongfully withheld. In the alternative, the Court should take a representative section of the withheld materials for *in camera* review and issue a ruling on the application of Exemption 5 to the withheld materials based on such review.

Respectfully submitted on March 29, 2019,

    /s/  Paula Dinerstein
Paula Dinerstein, DC Bar # 333971

31

Responsibility

Public     Employees     for     Environmental

962 Wayne Ave, Suite 610
Silver Spring, MD 20910
(202) 265-7337
pdinerstein@peer.org

*Counsel for Plaintiff*