# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,<br><br>    Plaintiff,<br><br>    v.<br><br>DEPARTMENT OF HOMELAND SECURITY,<br><br>    Defendant. | Civil Action No. 18-cv-158 (CKK) |

## SUPPLEMENTAL DECLARATION OF LEILONI STAINSBY

I, Leiloni Stainsby, hereby declare, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

1. I am the Acting Director for the National Preparedness Directorate, Federal Emergency Management Agency ("FEMA"), United States Department of Homeland Security ("DHS"). I have held this position since July 2018. In this capacity, I am responsible for the development and delivery of national risk and capability assessments. I have been with the Department since November 2011.

2. I make this supplemental declaration based on my personal knowledge of FEMA's intent to choose the National Threat and Hazard Identification and Risk Assessment (THIRA) as its main risk assessment vehicle in 2015. The purpose of this declaration is to provide information concerning why FEMA began using the THIRA instead of the Strategic National Risk Assessment (SNRA) as its national risk assessment vehicle, what FEMA hoped to accomplish through use of a National THIRA, and to address specific points made in Plaintiff's motion/opposition brief.

**Moving to the National THIRA**

3. In 2015, Timothy W. Manning, then-Deputy Administrator of Protection and National Preparedness,[1] recommended to then-Administrator W. Craig Fugate the inclusion of the THIRA as part of Fiscal Year 2016 Annual Planning Guidance.[2] Certain data from the SNRA would be used in developing the National THIRA. Both the THIRA and the SNRA were part of the formulation of a decision that would identify threats and hazards that needed to be addressed in various jurisdictions and how they should go about addressing the threats and hazards identified, pursuant to Presidential Policy Directive 8.[3] This involves policy judgments made by FEMA based on selectively culled factual information.

4. The THIRA process enables a jurisdiction to examine current and future risks and resource requirements. Those jurisdictions and regions completing a THIRA use the information to support planning and investment strategies.

5. Starting in 2011, the major urban areas, states, tribal nations, and territories receiving Homeland Security Grant Program (HSGP) or Tribal Homeland Security Grant Program (THSGP) funds and the ten (10) FEMA Regions completed an annual THIRA.

6. The National Preparedness Directorate used the information to promote data-driven policy decisions to prioritize the development of planning guidance, training courses, and exercises.

---

[1] Currently the National Preparedness Directorate.
[2] Timothy W. Manning and W. Craig Fugate are no longer with FEMA.
[3] Presidential Policy Directive 8 is meant to strengthen "the security and resilience of the United States through systemic preparation for the threats that pose the greatest risk to the security of the Nation, including acts of terrorism, cyber attacks, pandemics, and catastrophic natural disasters." PPD-8, p. 1.

7.      THIRA data, through 2015, was specific to the jurisdiction completing the assessment and could not be "rolled up" into a national perspective. To further the strategic plan objectives identified in FEMA's FY 2016 Annual Planning Guidance, the then-Protection and National Preparedness component proposed adding a National THIRA to the guidance to gain a risk-informed understanding of the catastrophic threats and hazards that affect the Nation, and the resources necessary to address those catastrophic incidents.

8.      In 2015, the National THIRA became FEMA's primary national assessment tool to identify national catastrophic threats facing the United States, its tribes and territories, and identifying resources that would be needed to prepare for, mitigate against and most effectively respond to these threats.  The 2015 SNRA that had been drafted was never finalized.

**Response to Plaintiff's Points**

9.      Plaintiff claims the "plenary literature review and body of factual information have been cited by FEMA or DHS on a number of occasions."  Reply Brief at 17.  In footnote 5, the quote from the National Prevention Framework, Second Edition (2016) references the National Preparedness Goal, Second Edition, which was published in September 2015, while the 2015 SNRA was still being drafted through November 2015.  Production 000044.  The same is true for Plaintiff's citations to the National Mitigation Framework, Second Edition (2016), and the National Response Framework, Third Edition (2016): both documents explicitly reference the National Preparedness Goal, Second Edition (2015).  In addition, the National Preparedness Goal fails to state which version of the SNRA results appear, because only one version of the SNRA was finalized and published: the December 2011 SNRA.

10.     Plaintiff mentions Nathan Anderson, Acting Director of the Government Accountability Office, and his public comments on February 27, 2019, regarding the updated

SNRA. Reply Brief at 7. Mr. Anderson stated that in June 2016 DHS reported it had completed a planned refresh of the SNRA, which included information on electromagnetic events. *Id*. at 7-8. The SNRA documents were intra-agency documents, so other agencies were likely to have possessed and reviewed the drafts. In addition, as Plaintiff's citation makes clear, Mr. Anderson referenced GAO-16-243 Electromagnetic Threats (2016). The GAO-16-243 was published in March of 2016, and regarding the SNRA, it states that "DHS acknowledged this responsibility through its inclusion of EMP as a risk event in the 2015 update of the Strategic National Risk Assessment (SNRA), noting that damage from a deliberate attack on the grid could cause cascading impacts through other infrastructure systems, leading to economic disruption and the potential loss of life." GAO-16-243 at 20. In 2019, Mr. Anderson was not able to reference documents later than the 2016 GAO-16-243 because the 2015 SNRA was never finalized. This further illustrates that releasing the draft SNRA would cause confusion not just with other federal agencies, but with the public as well, as they would believe the SNRA is still the main national risk assessment vehicle, when it is not.

11.  Plaintiff quotes the May 2015 Findings Review of the SNRA[4] to claim that "[c]learly the deliberative process was completed by the time this document was created." Reply Brief at 8. Plaintiff believes that if stakeholders reviewed draft findings, then the deliberative process was completed. Stakeholders reviewing the draft findings is only one part of the deliberative process, not the beginning, and certainly not the ending of the process. As I stated in my previous Declaration, FEMA's National Integration Center (NIC) "did not send the SNRA

---

[4] "… the assessment treated impact categories separately (e.g. economic impacts are reported separately from fatality impacts). This allowed stakeholders to apply their own expert judgments to the findings and decide how those findings should inform core capabilities in the Goal." Production 000084.

Documents through the formal concurrence process and NPD leadership did not approve them. Without review and concurrence, the SNRA Documents were never finalized or publicly released." Stainsby Decl. at ¶4.  The deliberative process could not be completed without review and approval from NPD leadership, which had the authority to reject any of the draft findings and recommendations.

12.	Plaintiff claims that because FEMA acknowledges the 2015 SNRA documents were intended to be released, they could not have been deliberative.  Reply Brief at 10.  The fact that a final approved SNRA was intended to be released does not mean that the predecisional version was not deliberative.  The facts in the 2015 SNRA documents reflect FEMA's deliberative process involving judgment calls as to what to include, as well as analyses and recommendations as to threats and hazards that should be included in a final SNRA.  Specific facts were selectively chosen out of larger sets of facts, and any of these could have been rejected during the final approval process.  The authors of the draft SNRA may well have been chilled from including certain facts, analyses and recommendations if they knew that these would be released even if rejected during the final approval process.  Exemption 5 provides protection for this part of the process.

13.	Plaintiff quotes Production 000070, which states that the draft SNRA documents "represents a fully adjudicated draft of the 2015 Strategic National Risk Assessment (SNRA) Findings document."  Production 000070.  Plaintiff claims this quote shows the entire review process was completed.  Reply Brief at 7, 14, and 20.  What this shows is that the draft SNRA documents were ready for NPD leadership to review.  The term "fully adjudicated draft" shows that it was still a draft.  As previously stated, NPD leadership failed to provide its review and concurrence so the SNRA remained a draft document.

14.     Plaintiff mentions the RAND Corporation's Homeland Security National Risk Characterization: Risk Assessment Methodology (2018) to claim that the SNRA reflects FEMA's current position regarding risks. Reply Brief at 18. Plaintiff did not fully quote RAND, which stated the following:

> We began data collection by conducting our own search for relevant open-source assessments. The 2015 SNRA was the starting point for data collection, although it did not address all threats and hazards included in the HSNRC. The documents found during these initial searches provided a useful, if incomplete, set of data on which to develop the risk summary sheets. In some cases, such as the assessment of natural disaster hazards, the data collected from these initial searches ultimately provided as many as half the citations used in the final risk characterization.
>
> Homeland Security National Risk Characterization: Risk Assessment Methodology (2018) at 34.

Although RAND believed the draft 2015 SNRA documents were "useful," it also believed they were "incomplete." This describes draft documents that were not finalized, the types of documents Exemption 5 was intended to protect. Releasing these documents would cause confusion to federal agencies and the public regarding what FEMA's actual position is regarding risks.

15.     Plaintiff claims that the release of the SNRA 2015 Update Background and General Guidance, SNRA 2015 Qualitative Data Instructions, and SNRA 2015 Risk Summary Sheet Instructions & Template, "has already caused whatever attenuated harm to decisionmaking processes which FEMA has alleged." Reply Brief at 25. These documents are guidance documents, containing instructions and templates. They do not include any of the threats, risks, analysis, data, or conclusions that were redacted. Plaintiff's claim that the disclosure of these guidance documents "discloses essentially the entire deliberative process" is inaccurate. *Id*. at 27. These guidance documents show stakeholders how to participate in the SNRA process: to send

6

data and risk summary sheets to FEMA. They do not describe the approval process mentioned in paragraph 4 of my previous Declaration or reveal any of the deliberative material that was redacted.

16. Plaintiff claims there is no explanation for why subjects of the Risk Summary Sheets in the table of contents of the SNRA Technical Appendix were withheld. *Id*. at 13 & 28. The redacted portions of the table of contents contains "[a] list of new and updated risks identified in the 2015 SNRA." Vaughn Index 51. Withholding the new and updated risks identified in the table of contents is consistent with the withholdings throughout the SNRA documents. Even though the Risk Summary Sheet authors were told to expect scrutiny from the public and other stakeholders, the underlying assumption is that this would happen after the 2015 SNRA documents were finalized and published, which did not occur. Releasing the new and updated risks in the SNRA would cause public confusion, as they would not represent FEMA's current position regarding risks, which can be found in the National THIRA.

17. Plaintiff claims there is more factual information that may be released. Reply Brief at 29. The Declaration of Gregory Bridges outlines why releasing more factual information is problematic:

> The information in these documents is deliberative because they consist of proposed factual findings, proposed assessments of information pertaining to threats and hazards, and other opinions, recommendations, and proposed conclusions made by the authors. Any factual information included in these documents consists of facts culled from a larger set of facts concerning threats and hazards. The authors of these documents used their judgment as to which facts to include and which facts to exclude, and thus release of this factual information would reveal their deliberative process in selecting pertinent facts to include in these draft documents. Additionally, the factual information is so entangled with the analyses and proposed conclusions in these documents that its release would reveal the deliberative process and, because the documents were never finalized, may not reflect FEMA's actual position regarding the risks and impacts such threats and hazards could present.

Bridges Decl. at ¶11.

Each of the updated risks is based on sets of facts selected from a larger set of facts by the drafters who were recommending that a specific risk or hazard be included in the final SNRA. Releasing these facts would allow for the updated recommended risks to be identified, which would cause confusion to the public, as these updated risks do not represent FEMA's current position regarding risks.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30th day of April 2019.

*Leiloni M Stainsby*
LEILONI STAINSBY