# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY
       Plaintiff,

    v.

DEPARTMENT OF HOMELAND
SECURITY,

       Defendant.

Civil Action No. 18-0158 (CKK)

## MEMORANDUM OPINION
(December 17, 2021)

This lawsuit arises from a Freedom of Information Act ("FOIA") request made by Plaintiff Public Employees for Environmental Responsibility ("PEER") to Defendant Department of Homeland Security ("DHS"). PEER requested information relating to the 2015 Strategic National Risk Assessment ("SNRA") prepared by the Federal Emergency Management Agency ("FEMA").[1] In response, FEMA withheld certain documents from PEER pursuant to FOIA Exemption 5.

Currently before the Court are Defendant Department of Homeland Security's [22] Motion for Summary Judgment and Plaintiff PEER's [24] Cross Motion for Summary Judgment. Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as whole, for the

---

[1] FEMA is a federal agency within the Department of Homeland Security. *See* FEMA, *Organization*, https://www.fema.gov/about/organization.

[2] The Court's consideration has focused on the following documents:
- Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 22;
- Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mot. & Opp'n"), ECF No. 24;
- Defendant's Reply in Support of its Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply & Opp'n"), ECF No. 27; and
- Plaintiff's Reply in Support of its Cross-Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 30.

reasons stated below, the Court finds that DHS properly withheld records pursuant to FOIA Exemption 5, and so shall **GRANT** DHS's Motion for Summary Judgment and **DENY** PEER's Cross-Motion for Summary Judgment.

## I.    BACKGROUND

This case concerns a FOIA request for, in relevant part, drafts of DHS's Strategic National Risk Assessment, one of two reports DHS has historically compiled to address systemic risks to national security (e.g., natural disasters and terrorist attacks).  The SNRA was initially executed in 2011 in support of Presidential Policy Directive 8 ("PPD-8") which called for the creation of a National Preparedness Goal, for which the SNRA served as the main risk assessment tool. *See* Dep't of Homeland Sec., The Strategic National Risk Assessment in Support of PPD 8: A Comprehensive Risk-Based Approach toward a Secure and Resilient Nation 1 (2011), https://www.dhs.gov/xlibrary/assets/rma-strategic-national-risk-assessment-ppd8.pdf. The SNRA was FEMA's comprehensive collection of the risks and hazards facing the United States, containing information and advice for how jurisdictions within the United States should address threats ranging from natural disasters to terrorism. *Id.*

At the same time, DHS developed a separate risk assessment vehicle, the Threat and Hazard Identification and Risk Assessment ("THIRA").  THIRA required the "major urban areas, states, tribal nations, and territories receiving Homeland Security Grant Program (HSGP) or Tribal Homeland Security Grant Program (THSGP) funds and the ten (10) FEMA regions" to complete an annual THIRA particular to their own geographic areas. Supplemental Declaration of Leiloni Stainsby ("Stainsby Suppl. Decl.") ¶ 5, ECF No. 28-1. THIRA enabled each "jurisdiction to examine current and future risks and resource requirements," and "use the information to support planning and investment strategies." *Id.* ¶ 4.

Multiple agencies and offices participated in the drafting of the SNRA, including FEMA's National Integration Center (NIC), which helps to develop "guidance and tools to assist communities in tackling their unique preparedness challenges and coordinates the adoption and implementation of a common incident management platform for emergency responders and officials." Declaration of Leiloni Stainsby ("Stainsby Decl.") ¶ 3, ECF No. 22-2. The NIC is a part of the National Preparedness Directorate (NPD), an organization within FEMA which assists people and communities in preventing and mitigating "against all threats and hazards." *Id.* The 2015 SNRA was intended to be the "risk-based analytic foundation of the National Preparedness Goal." *Id.* The NIC sent the draft SNRA documents in April of 2015 to several offices within FEMA for review.[3] *Id.* ¶ 4.

As the SNRA was in the process of being drafted, FEMA decided to make the new National THIRA its main risk assessment tool, as opposed to the SNRA. Stainsby Suppl. Decl. ¶ 8. While THIRA data up to that point had been jurisdiction-specific and "could not be 'rolled up' into a national perspective," Stainsby Suppl. Decl. ¶ 7, the National THIRA was intended to "identify national catastrophic threats facing the United States, its tribes and territories, and identifying resources that would be needed to prepare for, mitigate against and most effectively respond to these threats," *id.* ¶ 8.

On September 1, 2017, PEER submitted a FOIA request to FEMA seeking to acquire the "SNRA 2015 Findings [Report], May 2015; (2) SNRA 2015 Technical Appendix, May 2015; (3) SNRA 2015 Working Papers, May 2015; (4) PPD-8 Implementation Plan, May 2011; (5) SNRA Terms of Reference, June 2011; (6) SNRA 2015 Update Background and General Guidance,

---

[3] These offices included the National Preparedness Assessment Division, "FEMA's Office of External Affairs, Office of Chief Counsel, National Preparedness Directorate, and Office of Response and Recovery." Stainsby Decl. ¶ 4 n.2.

February 2015; (7) SNRA 2015 Qualitative Data Instructions, February 2015; (8) SNRA 2015 Risk Summary Sheet Instructions & Template, February 2015; and (9) any successor SNRA versions later than May 2015." Compl. ¶ 3, 20, ECF. No. 1; *see also* Pl.'s Mot. at 1. PEER is a "non-profit organization dedicated to research and public education concerning the activities and operation of federal, state, and local governments." *Compl.* ¶ 2.

FEMA acknowledged receipt of PEER's FOIA request on September 12, 2017. *Id.* ¶ 22; Def.'s Answer ¶ 1, ECF No. 9.  On December 12, 2017, PEER contacted both the DHS and FEMA FOIA Officers about the status of its FOIA request. Compl. ¶ 23; Def.'s Answer ¶ 23. PEER allegedly received contradictory responses regarding which component of DHS handles such FOIA requests. Compl. ¶ 23. *But see* Def.'s Answer ¶ 23 ("FEMA avers it replied to the email and informed Plaintiff that the FOIA request was closed.").

PEER filed this lawsuit on January 25, 2018 after FEMA failed to respond to PEER's FOIA request within the statutory deadline. Compl. ¶ 24; Def.'s Answer ¶ 24.  As a response to PEER's lawsuit, FEMA produced, in full, the SNRA 2015 Update Background and General Guidance, February 2015; the SNRA 2015 Qualitative Data Instructions, February 2015; and the SNRA 2015 Risk Summary Sheet Instructions & Template, February 2015. Declaration of Gregory Bridges ("Bridges Decl.") ¶ 4, ECF No. 22-1. FEMA further partially released several other SNRA documents under FOIA Exemption 5. *See id.* ¶ 5.

In total, FEMA produced 716 Bates-stamped pages of material. *See* Declaration of Paula Dinerstein ("Dinerstein Decl.") ¶ 3, ECF No. 24-2. On September 10, 2018, FEMA produced a *Vaughn* Index identifying and detailing the redactions and withholdings. Bridges Decl. ¶ 6; Dinerstein Decl. ¶ 4. FEMA claimed an exemption pursuant to FOIA Exemption 5. Bridges Decl. ¶ 9.

Each party then cross-moved for summary judgment. *See* Def.'s Mot.; Pl.'s Mot. & Opp'n. PEER challenges FEMA's withholding of certain documents pursuant to FOIA Exemption 5. Pl.'s Mot. & Opp'n. FEMA claims that they validly withheld documents pursuant to the Deliberative Process Privilege under FOIA Exemption 5. Def.'s Mot.

## II.     LEGAL STANDARD

The FOIA authorizes a district court only "to enjoin [a federal] agency from withholding agency records or to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). This case, like a "vast majority" of FOIA cases, can be decided on summary judgment. *See Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

Summary judgment is appropriate upon a showing that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, the Court may award summary judgment to an agency solely on the information provided in affidavits or declarations when they describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *accord Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *see also Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). Rather, a plaintiff "must point to

evidence sufficient to put the Agency's good faith into doubt." *Ground Saucer*, 692 F.2d at 771. Otherwise, "'uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail.'" *Schoenman v. FBI*, 841 F. Supp. 2d 69, 80 (D.D.C. 2012) (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (alteration omitted)).

On summary judgment, the district court must conduct a "de novo" review of the record, 5 U.S.C. § 552(a)(4)(B), "to ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure." *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (citation and internal quotation marks omitted). "Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents." *Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993). Only after an agency has proven that "it has fully discharged its disclosure obligations" is summary judgment appropriate. *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

## III.    DISCUSSION

Exemption 5 of the FOIA protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To fall within Exemption 5, "a document must meet two conditions: 'its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it.'" *Stolt-Nielsen Transp. Grp. v. United States*, 534 F.3d 728, 733 (D.C. Cir. 2008) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). In essence, Exemption 5 provides grounds for withholding documents that would fall under a variety of recognized privileges available to Government agencies in civil litigation including, of relevance to this case,

the deliberative process privilege. However, establishing that a document falls under a particular privilege is not enough to justify withholding; the agency must also demonstrate that disclosure of the document will lead to a foreseeable harm. 5 U.S.C. § 552(a)(8)(A)(i) ("An agency shall . . . withhold information under this section only if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . .").

A. The Deliberative Process Privilege

The deliberative process privilege is intended to "prevent injury to the quality of agency decisions." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). More specifically, the privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). To that end, the privilege protects "documents and other materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (internal quotation marks and citation omitted).

For the privilege to apply, the government must establish that the material at issue is both "predecisional" and "deliberative" in nature. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785–86 (2021). "A document is predecisional if it was 'prepared in order to assist an agency decision maker in arriving at his decision,' rather than to support a decision already made."

*Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). A document is deliberative if "it reflects the give-and-take of the consultative process," *Coastal States*, 617 F.2d at 866, and if it was "prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786; *see also Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010) ("To qualify under Exemption 5, a document must also be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.") (internal quotation marks omitted).

### 1. The SNRA Documents are Predecisional

First, both the Government and PEER point out that the SNRA documents were labelled a "fully-adjudicated draft," with the Government emphasizing the "draft" language and PEER emphasizing the "fully-adjudicated" aspect. Although draft documents are not per se exempt from disclosure, *see Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982), they often fall within the protection of the deliberative process privilege because "[a] draft is, by definition, a preliminary version of a piece of writing subject to feedback and change," *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786. "It is true that a draft document will typically be predecisional because . . . calling something a draft communicates that it is not yet final." *Id.* at 788; *see also People for the Am. Way. Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 303 (D.D.C. 2007) (noting that drafts are "commonly found exempt under the deliberative process exemption" because they precede the final decision).

Although labelling a document a "draft" is not dispositive as to the question of whether a document is pre-decisional, evaluating the SNRA documents "in the context of the administrative process which generated them," *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786 (quoting *Sears*,

421 U.S. at 138), compels the conclusion that the documents are pre-decisional. The Bridges

Declaration explains that:

> [T]he 2015 SNRA documents were developed to be used in preparing the 2015 National Preparedness Goal, which was published in September 2015. None of the documents with Exemption 5 withholdings could become final without formal federal interagency concurrence and senior-level White House approval. This included approval of the factual information contained within these documents, all of which was culled from a broader set of facts pertaining to threats and hazards, through the exercise of judgment by the authors of these 5 documents. Since FEMA never received the required interagency concurrence and White House approval, the SNRA documents received no formal approval within FEMA.

Bridges Decl. ¶ 10.

The Stainsby Declaration further explains that "the NIC [National Integration Center] did

not send the SNRA Documents through the formal concurrence process and NPD [National

Preparedness Directorate] did not approve them. Without review and concurrence, the SNRA

Documents were never finalized or publicly released." Stainsby Decl. ¶ 4. Thus, the SNRA

documents were generated before FEMA's final agency decision and are predecisional.

Moreover, that FEMA characterized the SNRA draft documents as "fully-adjudicated"

does not imply that the agency viewed them as final or as the consummation of the agency's views

on the matter. *See U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 788 (explaining that determining

whether an "agency's position is final for purposes of the deliberative process privilege is a

*functional* rather than *formal* inquiry) (emphasis added). At most, the term "fully-adjudicated

draft" implies that the SNRA documents were considered by the agency to be sufficiently complete

such that the agency could then decide on particular policies and actions it could take. Although

"the draft SNRA documents were ready for NPD leadership to review . . . NPD leadership failed

to provide its review and concurrence," Stainsby Suppl. Decl. ¶ 13, meaning the documents do not

represent the agency's final position or view. Further, the determinative fact for whether a

document is "predecisional" is not the document's "level of polish," but whether a document represents an agency's final decision. *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 788.

PEER also argues that the SNRA documents are not pre-decisional because "[t]here has been no showing that the SNRA [documents] . . . led to any policy decision." Pl.'s Mot. & Opp'n at 10. PEER further argues that a "court must 'be able to pinpoint an agency decision or policy to which these documents contributed.'" *Id.* at 9 (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983). Not so.

Recently, the Supreme Court clarified that "[a] document is not final solely because nothing else follows it. Sometimes a proposal dies on the vine." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786 (citing *National Security Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014)). Thus, a document may be predecisional despite no final decision being made. *Id.* Moreover, "documents discussing such dead-end ideas can hardly be described as reflecting the agency's chosen course." *Id.* (citing *Sears*, 421 U.S. at 150–151). "What matters, then, is not whether a document is last in line, but whether it communicates a policy on which the agency has settled." *Id.* That the SNRA documents did not lead to any final policy decision by FEMA is, therefore, irrelevant as to whether the documents are predecisional.

Finally, PEER argues that the SNRA documents are not predecisional because FEMA itself has referenced the SNRA documents and other entities outside of FEMA have either referenced or used information from the SNRA. *See* Pl.'s Mot. & Opp'n at 17–18; Pl.'s Reply at 4–8. Whereas the agency usually holds the burden to show why an exemption applies, the requester bears the burden to show why "an otherwise predecisional and deliberative document has lost its privileged status through adoption." *Gellman v. Dep't of Homeland Sec.*, 525 F. Supp. 3d 1, 7 (D.D.C. 2021);

*see also McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 849 F. Supp. 2d 47, 63 n.14 (D.D.C. 2012). For the following reasons, the Court finds that PEER has not met this burden.

PEER first points to several publications released by FEMA that reference the SNRA.[4] *See, e.g.*, Pl. Mot. & Opp'n at 17 n.5 ("Results of the Strategic National Risk Assessment (SNRA), contained in the second edition of the National Preparedness Goal, indicate that a wide range of threats and hazards continue to pose a significant risk to the Nation." (quoting Dep't of Homeland Sec., *National Prevention Framework, Second Edition* 4 (2016))). The Stainsby Supplemental Declaration responds:

> In footnote 5, the quote from the National Prevention Framework, Second Edition (2016) references the National Preparedness Goal, Second Edition, which was published in September 2015, while the 2015 SNRA was still being drafted through November 2015. The same is true for Plaintiff's citations to the National Mitigation Framework, Second Edition (2016), and the National Response Framework, Third Edition (2016): both documents explicitly reference the National Preparedness Goal, Second Edition (2015). In addition, the National Preparedness Goal fails to state which version of the SNRA results appear, because only one version of the SNRA was finalized and published: the December 2011 SNRA.

Stainsby Suppl. Decl. ¶ 9. Given that the 2015 SNRA was still being drafted several months after the release of the Second Edition of the National Preparedness Goal, the Court finds that it is reasonable that the version of the SNRA referenced by the NPG is the 2011 SNRA. Moreover, even if PEER is correct that the NPG relies, in part, on findings from the 2015 SNRA, that fact alone would not change the predecisional nature of the 2015 SNRA; the 2015 SNRA would be both predecisional and deliberative as to the NPG.

PEER next points to comments made by the Acting Director of the Government Accountability Office ("GAO"), Nathan Anderson, on February 27, 2019 that "[i]n June 2016,

---

[4] These documents include the 2015 National Preparedness Goal, Second Edition ("NPG"); the National Prevention Framework, Second Edition; the National Mitigation Framework, Second Edition; and the National Response Framework, Third Edition. *See* Stainsby Suppl. Decl. ¶ 9.

DHS reported that the department completed the planned refresh of the Strategic National Risk Assessment." Pl.'s Reply at 7. Anderson further referenced a 2016 GAO Report on Electromagnetic Threats that cites to the 2015 SNRA. *Id.*; Pl.'s Mot. & Opp'n at 17.

In response, the government explains that "Mr. Anderson stated that in June 2016 DHS reported it had completed a planned refresh of the SNRA, which included information on electromagnetic events. The SNRA documents were intra-agency (sic) documents, so other agencies were likely to have possessed and reviewed the drafts." Stainsby Suppl. Decl. ¶ 10.

> In addition, as Plaintiff's citation makes clear, Mr. Anderson referenced GAO-16-243 Electromagnetic Threats (2016). The GAO-16-243 was published in March of 2016, and regarding the SNRA, it states that "DHS acknowledged this responsibility through its inclusion of EMP as a risk event in the 2015 update of the Strategic National Risk Assessment (SNRA), noting that damage from a deliberate attack on the grid could cause cascading impacts through other infrastructure systems, leading to economic disruption and the potential loss of life." In 2019, Mr. Anderson was not able to reference documents later than the 2016 GAO-16-243 because the 2015 SNRA was never finalized.

*Id.*

While Anderson's 2019 comments suggest that, from his understanding, DHS had finalized the 2015 SNRA, "courts must consider whether the agency treats the document as its final view on the matter." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786 (citing *Sears*, 421 U.S. at 161). Thus, it is not the GAO's treatment of the SNRA that is relevant to whether the documents are pre-decisional, but DHS's. While the GAO may have relied upon findings from the 2015 SNRA for its own reports, that fact alone bears no weight on whether DHS treated the SNRA "as its final view on the matter." *Id.* A document does not necessarily lose its predecisional status merely because it is shared inter-agency. After all, Exemption 5 specifically applies to both intra and inter-agency documents. *See* 5 U.S.C. § 552(b)(5) ("This section does not apply to matters that are . . .

inter-agency or intra-agency memorandums or letters . . . .”). Therefore, the Court finds that GAO’s references to the 2015 SNRA do not strip the SNRA of predecisional status.

Finally, PEER points out that the RAND Corporation referenced the 2015 SNRA documents in its 2018 Homeland Security National Risk Characterization: Risk Assessment Methodology. Pl.’s Mot. & Opp’n at 18. RAND, a private organization, contracted with DHS in 2016 to prepare this report. *Id.*; Def.’s Opp’n & Reply at 7. PEER argues that RAND’s reference to the 2015 SNRA suggests that the SNRA “is clearly unfinished in name only,” and thus not predecisional or deliberative. Pl.’s Reply at 8. RAND described the 2015 SNRA as “the starting point for data collection, although it did not address all threats and hazards included in the HSNRC. The documents found during these initial searches provided a *useful, if incomplete*, set of data on which to develop the risk summary sheets.” Stainsby Suppl. Decl. ¶ 14 (quoting RAND Corp., *Homeland Security National Risk Characterization: Risk Assessment Methodology* (2018)) (emphasis added).

That RAND relied on certain data from the 2015 SNRA in formulating the 2018 HSNRC does not, by itself, cause the SNRA documents to lose their predecisional status. While it is true that a draft may “lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public,” *Arthur Andersen*, 679 F.2d at 258, the mere fact that a draft document has some practical effect or consequence on an agency does not mean that the draft “constitutes a final administrative decision.” *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 788. As the Stainsby Supplemental Declaration makes clear, “[a]lthough RAND believed the draft 2015 SNRA documents were ‘useful,’ it also believed they were ‘incomplete.’ This describes draft documents that were not finalized, the types of documents Exemption 5 was intended to protect.” Stainsby Suppl. Decl. ¶ 14. Because the 2015 SNRA draft

documents were neither finalized by agency leadership nor completed, their later use by RAND does not strip them of their predecisional and deliberative character.

## 2. The SNRA Documents are Deliberative

The Court also finds that the SNRA documents are "deliberative." The Supreme Court has recently explained that there is considerable overlap between predecisional and deliberative "because a document cannot be deliberative unless it is predecisional." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786. Thus, much of the prior discussion as to the predecisional status of the SNRA documents bears on the deliberative nature of the documents as well.

PEER argues that the SNRA documents do not involve "policy discussions or 'bear[] on the formulation or exercise of agency policy-oriented *judgment*,'" but are, instead, "a factual tool . . . generally available to any number of decisionmakers to assist in any kind of decision." Pl.'s Mot. & Opp'n at 16. Further, PEER contends that the 2015 SNRA documents do "not contain specific policy stances, but general information which can and should be used by a broad audience." *Id.* at 18.

In response, the Bridges Declaration explains that the SNRA documents contain "proposed factual findings, proposed assessments of information pertaining to threats and hazards, and other opinions, recommendations, and proposed conclusions made by the authors." Def.'s Mot. at 5 (quoting Bridges Decl. ¶ 11). The Court is unpersuaded by PEER's argument that the SNRA contains no policy stances or "policy-oriented judgment." Pl.'s Mot. & Opp'n at 16. The SNRA documents were drafted with the intent to form the basis of the 2015 National Preparedness Goal, *see* Stainsby Decl. ¶ 3, and, thus, were "prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786 (citations omitted).

As discussed *supra*, that there was no final agency decision or document to which the SNRA contributed is irrelevant because "[a] document is not final solely because nothing else follows it." *Id.* As the agency's declaration makes clear, the SNRA reflects the give-and-take of the agency decision-making process. *See Coastal States*, 617 F.2d at 866. The documents contain information "entangled with . . . analyses and proposed conclusions" expressing the author's preliminary views on a variety of threats and risks facing the United States. Def.'s Mot. at 5 (quoting Bridges Decl. ¶ 11). Moreover, the SNRA documents are deliberative because they were drafted "to help the agency formulate its position" regarding various risks and hazards that, in the opinion of the drafters, the United States faced. *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786 (citations omitted).

PEER further argues that even if the SNRA documents are, in part, deliberative, DHS must disclose the purely factual material contained within the SNRA. *See* Pl.'s Mot & Opp'n at 21–27. In general, purely factual material cannot be withheld unless it reflects an "exercise of discretion and judgment calls." *Ancient Coin Collectors*, 641 F.3d at 513 (quoting *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993). "[T]he legitimacy of withholding does not turn on whether the material is purely factual in nature . . . but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Id.* (citing *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974)). DHS responds that the entirety of the SNRA must be withheld because the factual material "is included in documents through the exercise of judgment calls requiring extracting facts from a larger set of facts." Def.'s Mot. at 5.

Further, the Bridges Declaration explains:

> Any factual information included in these documents consists of facts culled from a larger set of facts concerning threats and hazards. The authors of these documents used their judgment as to which facts to include and which facts to exclude, and thus release of this factual information would reveal

their deliberative process in selecting pertinent facts to include in these draft documents.

Def.'s Mot. at 5 (quoting Bridges Decl. ¶ 11).

The D.C. Circuit has considered the withholding of purely factual material in several cases. In *Mapother*, the court recognized that while, in general, "factual material must be disclosed but advice and recommendations may be withheld," 3 F.3d at 1537 (quoting *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)), this fact/opinion distinction "is not infallible and must not be applied mechanically." *Id.* (citing *Wolfe*, 839 F.2d at 774). As the court noted, "[t]his is so because the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." *Id.* (citations omitted).

At issue in *Mapother* was whether a report prepared for the Attorney General by the Office of Special Investigations ("OSI") regarding whether a particular individual "may have participated in war crimes as an officer in the army of Nazi Germany" could be withheld. *Id.* at 1535. Although the report contained mainly factual material, the court found that because the report required the authors "to cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and to identify the significant issues they encountered along the way," disclosure of such facts would reveal the deliberative process at play. *Id.* at 1538. The court distinguished the OSI Report from that of an earlier case, *Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931 (D.C. Cir. 1982), relied upon by PEER here, on the grounds that the disputed documents in *Playboy Enterprises* were merely an investigative report "prepared only to inform," while the OSI Report was "assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." *Mapother*, 3 F.3d at 1539.

Similarly, in *Ancient Coin Collectors*, the D.C. Circuit held as sufficient the agency's declaration that the factual summaries contained in the withheld reports "'were culled by the [agency] from the much larger universe of facts presented to it' and reflect an 'exercise of judgment as to what issues are most relevant to the pre-decisional findings and recommendations.'" 641 F.3d at 513.

PEER attempts to distinguish *Mapother* and *Ancient Coin Collectors* from the instant case by arguing that the factual "culling" in the SNRA "is solely from public unclassified documents and concerns a very broad array of risks and harms not specific to any decisionmaker or decision." Pl.'s Mot. & Opp'n at 26. This is a distinction without a difference. Neither *Mapother* nor *Ancient Coin Collectors* base their holding on the breadth of risks or scope of decisions that the factual material relates to. A document does not lose its deliberative status merely because its author intended that the material have broad application. If anything, that the SNRA documents were intended to benefit multiple officials in taking multiple discretionary actions emphasizes their deliberative nature. And unlike the report at issue in *Playboy Enterprises*, the SNRA was drafted not as a mere investigative report designed only to inform, but instead to provide agency decisionmakers and policy makers materials and analyses which they could rely upon in formulating policy and taking actions. Moreover, *Ancient Coin Collectors* makes clear that whether the withheld factual material "is already in the public domain," is irrelevant to whether that material is deliberative. *Ancient Coin Collectors*, 641 F.3d at 513.

B.   The Foreseeable Harm Requirement

Pursuant to the FOIA Improvement Act of 2016, "[a]n agency shall withhold information" under the discretionary FOIA exemptions, including Exemption 5, "only if the agency reasonably foresees that disclosure would harm an interest protected by" a discretionary exemption or if

"disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "Stated differently, pursuant to the FOIA Improvement Act, an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law." *Rosenberg v. Dep't of Def.,* 342 F. Supp. 3d 62, 73 (D.D.C. 2018); *see also Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019).

Although the Court is satisfied that the SNRA documents fall under the deliberative process privilege, the documents may be withheld only if the government clearly establishes a risk of foreseeable harm from disclosure. *See, e.g.*, *Rosenberg*, 342 F. Supp. 3d at 73. "Agencies cannot rely on 'mere "speculative or abstract fears," or fear of embarrassment' to withhold information." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting S. Rep. No. 4, 114th Cong., 1st Sess. 8 (2015)). Nor may the government meet its burden with "generalized assertions[.]" *Machado Amadis v. Department of State*, 971 F.3d 364, 371 (D.C. Cir. 2020). The agency must articulate, in a "focused and concrete" way, the harm that would result from disclosure, including the basis and likelihood of that harm. *Reporters Comm.*, 3 F.4th at 369.

The D.C. Circuit has addressed the foreseeable harm requirement in two recent cases. In *Machado Amadis*, the court upheld the agency's withholding of so-called "Blitz Forms" containing certain legal "recommendations, discussion, and search notes" for FOIA appeals, finding that the agency had met the foreseeable harm requirement. *Machado Amadis*, 971 F.3d at 370–71. The agency's declaration stated that disclosure of the forms would discourage line attorneys from "candidly discuss[ing] their ideas, strategies, and recommendations," thereby hindering "the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals." *Id.* at 371 (quoting agency declaration). The court rejected the plaintiff's argument that

the agency had provided only "generalized assertions that 'could' chill deliberations." *Id.* (quoting

plaintiff's brief). Instead, the court explained, the agency "specifically focused on the information

at issue" in the withheld material and had "concluded that disclosure of that information 'would'

chill future discussions." *Id.* (quoting agency declaration). Accordingly, the agency met the

foreseeable harm requirement.

      The D.C. Circuit again addressed the foreseeable harm requirement in *Reporters*

*Committee*. There, the plaintiff had submitted multiple FOIA requests for records about FBI agents

impersonating reporters. *Reporters Comm.*, 3 F.4th at 356–57. The FBI withheld information under

the deliberative process privilege, including emails between Director James Comey and agency

officials on a public editorial written by Comey about the incident. *See id.* at 360–61.

      The FBI provided several reasons as to why disclosure of the requested materials would

lead to harm, all of which the court deemed "boilerplate and generic assertions" insufficient to

meet the foreseeable harm requirement.  *See id.* at 370–72. First, the FBI's main declaration said

that disclosing the material "would have an inhibiting effect upon agency decisionmaking and the

development of policy" because disclosure "would chill full and frank discussions" within the

agency. *Id.* at 370. Further, the declaration proclaimed that agency personnel would be "less candid

and more circumspect in expressing their thoughts, which would impede the fulsome discussion

of issues necessary to reach a well-reasoned decision." *Id.* The court rejected the sufficiency of

this explanation, finding that the FBI had merely "mouth[ed] the generic rationale for the

deliberative process privilege itself." *Id.*

      The other declarations provided by the FBI and the Justice Department similarly failed to

demonstrate in a specific manner the harm that would result from disclosure. *See, e.g.*, *id.*

(disclosure "would set a precedent where employees would come to fear their unrefined opinions

could become subject to public disclosure through the FOIA" (quoting agency declaration)). The court held that the government's assertion that disclosure "would be harmful as the draft would also reveal the thought and decision-making processes," *id.* at 371, of the agency was a "cookie-cutter formulation[]" that failed to adequately explain "why actual harm would foreseeably result from release of the *specific* type of material at issue here," *id.* (emphasis added). The court further explained that the declaration's contention that disclosure "would potentially confuse the public about the reasons" for the agency's actions "is *precisely* the kind of boilerplate, unparticularized, and hypothesized assertion of harm that we said would be insufficient in *Machado Amadis*." *Id.* (citing 971 F.3d at 371).

To satisfy the foreseeable harm requirement, the FBI needed to give a "focused and concrete" explanation for why disclosure of the withheld material would, "in the specific context of the agency action at issue, actually impede those same agency deliberations moving forward." *Id.* at 370. Instead, the FBI submitted "perfunctory, sweeping, and undifferentiated declaration[s]" which failed to "explain the particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes (and, therefore, whether and how their release would harm similar deliberations in the future)." *Id.* at 372.

With these D.C. Circuit cases in mind, the Court finds that DHS has adequately demonstrated how release of the SNRA "would harm an interest protected by the [deliberative process] exemption," *Reporters Comm.*, 3 F.4th at 372 (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)), and has "articulate[d] . . . the link between the specified harm and specific information contained in the material withheld," *id.* (quoting H.R. Rep. No. 391, 114th Cong., 2d Sess. 9 (2016)).

Admittedly, the first Stainsby Declaration fails to assert anything more than the type of boilerplate language rejected in *Reporters Commission*. For example, the declaration repeatedly

states that disclosure "would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel." Stainsby Decl. ¶¶ 6, 8, 10, 12, 14, 16, 18. This language, which appears seven times in the seven-page declaration, is exactly the type of "cookie-cutter" and undifferentiated assertion of harm that fails to satisfy the foreseeable harm requirement. *See Reporters Comm.*, 3 F.4th at 371 ("Its cookie-cutter formulations nowhere explain why actual harm would foreseeably result from release of the specific type of material at issue here.").

However, the Bridges Declaration fares better than the Stainsby Declaration as it goes beyond the merely formulaic and boilerplate by addressing how the specific information within the documents relates to a particular risk of harm. The declaration explains that disclosure of the SNRA would harm FEMA "by prematurely revealing threats and hazards . . . [which] would . . . cause confusion to the public and may result in members of the public taking action on potential threats and hazards where no action is warranted," or in a manner not "suggested by a recommendation contained in the documents." Bridges Decl. ¶ 12. Unlike the boilerplate language rejected in *Reporters Commission* that disclosure of the disputed documents "would potentially confuse the public," *Reporters Comm.*, 3 F.4th at 371, the agency's declaration here articulates a specific link between the specified harm—public confusion—and the nature of the withheld documents. Indeed, this articulation of the foreseeable harm of disclosure is arguably more specific and focused than that approved of in *Machado Amadis*. *See* 971 F.3d at 371 ("[The agency's] affidavit adequately explained that full disclosure of the Blitz Forms would discourage line attorneys from 'candidly discuss[ing] their ideas, strategies, and recommendations,' thus impairing 'the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals.'").

21

FEMA has explained not just that release of the 2015 SNRA would cause public confusion, but specifically articulated how the nature of the information contained within the documents— threats, hazards, and recommendations—would cause such confusion. Further, the D.C. Circuit has long recognized that the risk of public confusion "has a special force with respect to disclosures of agency positions or reasoning concerning proposed policies." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1436 n.10 (D.C. Cir. 1992).

The government provides other explanations of the foreseeable harm resulting from disclosure of the SNRA documents that similarly satisfy its burden under the 2016 FOIA Improvement Act. The Supplemental Stainsby Declaration explains that release of the SNRA "would cause confusion not just with other federal agencies, but with the public as well," because they might incorrectly believe "the SNRA is still the main national risk assessment vehicle, when it is not." Stainsby Suppl. Decl. ¶ 10. Such an explanation does not merely "mouth[] the generic rationale for the deliberative process privilege itself," *Reporters Comm.*, 3 F.4th at 370, but instead specifies how exactly the risk of confusion arises from the disclosure of the particular information contained within the documents. As the SNRA is no longer used by FEMA as the main risk assessment vehicle, the declaration's explanation that the public and other agencies may mistakenly think that the opposite is true if disclosed is neither conclusory nor generalized; it links the harm with the particulars of the documents at issue. Relatedly, the declaration also explains that disclosure of the SNRA would cause confusion among both the public and other federal agencies regarding "FEMA's actual position is regarding risks," Stainsby Suppl. Decl. ¶ 14, as the risks and threats discussed in the SNRA "would not represent FEMA's current position regarding risks, which can be found in the National THIRA," *id.* ¶ 16.

C. Segregability

Although the Court concludes that GSA properly withheld the Category 2, 3, and 4 records, it must also "make specific findings of segregability regarding the documents to be withheld." *Stolt-Nielsen Transp. Grp.*, 534 F.3d at 734 (internal quotation marks omitted) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)); *see also Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) (explaining that a district court has "an affirmative duty to consider the segregability issue *sua sponte*)" (internal quotation marks omitted) (quoting *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F. 3d 1022, 1028 (D.C. Cir. 1999)).

"Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117. Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice. *Id.* (internal quotation marks omitted); *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the Vaughn index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").

Granting DHS its due presumption of regularity, the Court finds that DHS has discharged its burden concerning segregability with respect to the SNRA documents. DHS's *Vaughn* Index provides a statement of its reasons for withholding the requested documents and its sworn declaration establishes that the records were reviewed "line-by-line" to ensure that the withheld information "contained no segregable, nonexempt information." Bridges Decl. ¶ 15 ("With respect to each piece of information withheld, no further information could be reasonably segregated from

the exempt information."). The Court has also conducted its own independent review of these documents and is satisfied that any non-exempt information contained therein is not reasonably segregable.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** DHS's Motion for Summary judgment, and **DENIES** PEER's Cross-Motion for Summary Judgment. An appropriate order accompanies this Memorandum Opinion.

Dated: December 17, 2021                          /s/_____
                                        **COLLEEN KOLLAR-KOTELLY**
                                        United States District Judge